Lawrence E. Henke
David L. Vicevich
Vicevich Law
3738 Harrison Ave.
Butte, MT 59701
larry@vicevichlaw.com
dave@vicevichlaw.com

Attorneys for Plaintiff

FILED
SEP 0 3 2021
By Tom Powers Clerk
Deputy Clerk

IN THE SECOND JUDICIAL DISTRICT COURT
STATE OF MONTANA, IN AND FOR THE COUNTY OF SILVER BOW

| | |
|---|---|
| CHARITY JONES,<br><br>Plaintiff,<br><br>v.<br><br>JORDAN GREER and<br>BUTTE-SILVER BOW PRIMARY<br>HEALTH CARE CLINIC,<br>d/b/a SOUTHWEST MONTANA<br>COMMUNITY HEALTH CENTER,<br><br>Defendants. | Case No. DV-21-255<br>ROBERT J WHELAN<br>JUDGE DEPT. II<br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL**<br><br>SUMMONS ISSUED |

COMES NOW the Plaintiff, Charity Jones, by and through her counsel of record, Lawrence E. Henke, and for its Complaint against Defendants Jordan Greer and Butte-Silver Bow Primary Health Care Clinic, assert and allege as follows:

### Introduction

Charity Jones suffers from a severe medical condition; she moved to Butte, Montana and went to Butte-Silver Bow Primary Health Care Clinic ("Community Health") where she requested a female doctor based on her background. Told the female doctors are not taking new patients, she was assigned to Dr. Jordan Greer. Beginning on May 17, 2021, Dr. Greer began pursuing her in a romantic context – she is married – and his conduct accelerated to stalking and sexual assault. Ms. Jones was an exceptionally vulnerable patient, which she fully explained to Community Health

and she expected her doctor to treat her with competence, dignity, and respect. Instead, Dr. Greer pursued her as an object of his sexual desire and exploited his position of power and authority to sexually assault Charity. He bombarded her with dozens of sexually explicit text messages and photos over a short time frame, which culminated in his dismissal from Community Health.

As a Greer's conduct was exposed, reported internally by another Community Health employee, Charity expected that her medical provider would respond properly – it did not. CEO Shawna Yates contacted her under the guise of "conducting an investigation" into a rumor. Yates, shockingly, merely told Charity that Greer was "supposed to have sent you a letter firing you as a patient before waiting 30 days to date you" in a June 16, 2021, call. Two days later, Yates called again; Charity asked "how can you hire a doctor who was suspended for four years?" and Yates replied "we believe in second chances."

Community Health knew it was putting a predatory doctor in the room, alone, with female patients.

Charity called Yates a month later to ask what was happening with the investigation and when she should give her statement; Yates informed her that the investigation "was dropped".

## I.
## Parties

1. Plaintiff Charity Jones ("Charity") was a resident of Butte, Silver Bow County, Montana, at all times relevant to the facts and claims set forth in this matter.

2. Defendant Butte-Silver Bow Primary Health Care Clinic is a Montana corporation with its principal place of business at 445 Centennial Ave., Butte, MT 59701.

3. Defendant Butte-Silver Bow Primary Health Care Clinic does business under the assumed name Southwest Montana Community Health Center ("Community Health").

4. Community Health can be served through its registered agent, Patrick Fleming, at 49 North Main St., Suite C, Butte, MT 59701.

## II.
## Venue and Jurisdiction

5. Venue is proper in Silver Bow County pursuant to MCA Title 25, Chapter 2, §§ 25-2-122 (1)(b), 25-2-122(2)(a) and (b), and/or 25-2-121(1)(b)(ii).

6. This Court has jurisdiction over the parties to this lawsuit because all reside in and the incidents in question took place in the State of Montana.

## III.
## Background Facts

7. Beginning in 2018, Charity was a patient of Community Health. She came to Montana to take a job in chemical dependency counseling; she enjoyed helping others. She was an avid outdoorswoman and developed a "rock-hound" hobby. In all aspects, Charity's move to Montana was one of rebirth and resurrection from a challenging set of circumstances in Virginia from which she sought a new start.

8. When Charity went to Community Health, she related in excruciating detail her past family history, social history, and emotional reasons for which she was seeking health care and specifically requested a female doctor.

9. Charity was informed by Community Health that the female doctors were not taking new patients, but this "new" doctor they had – Dr. Jordan Greer – is a "really good guy" so she was convinced by Community Health to see Dr. Greer.

10. Community Health did not disclose Greer's past medical suspension of his license; Community Health did not disclose Greer's recent surrender of his medical license; and, Community Health did not disclose his extensive criminal history.

11. Greer treated her for over a year, providing specific care for her primary ailment (an organ issue) and also provided other medical services. She didn't realize at the time, but he provided her with gynecological exams but never referred her to a gynecologist, which is now known as a technique Greer used to sexually arouse himself.

12. On May 17, 2021, Charity went to her 4:30 p.m. appointment with Greer at Community Health; she was there to have blood drawn for monitoring purposes of her medical condition.

13. In the exam room, Greer noted she had a cold sore on her lip and them made the odd comment that she "looked sprightly and chipper" by commenting on her appearance.

14. Charity was taken aback because he never before engaged in personal chatting, but she guardedly replied that she had been camping (she enjoyed the outdoors) and she casually mentioned that her back was sore from sleeping on the ground.

15. Greer then changed tone and tenor of his voice, and he said he could "adjust" her. He referenced that he had chiropractic experience and could do it, but she "couldn't tell anyone" because he was not supposed to be doing this.

16. Greer proceeded to have Charity lie on the exam table, he then moved her to her side, manipulated her leg into a bent position, and then cradled her body into his, pressing her breasts against him.

17. He repositioned her again, moved her to her other side, then again placed his arms around her and pressed her breasts into his body.

18. Once this was done, he again told her: "You can't tell anyone I did this."

19. Greer then sat down, and he made a comment to her that her last urine test showed irregularities.

20. Greer then proceeded to talk about how he would do a "clean catch" from women for urine samples, then strangely segued into this colloquy:

   a. I really can't go more than a day without sex;

   b. I'm tired of eating pussy from fat prostitutes in Butte;

   c. I like how you are;

   d. I prefer women who don't shave their vagina; and

   e. I really like it when women don't wash down there; I like the natural smell like yours.

21. Up to this point in her treatment history with Greer, his conversations with her were at least couched in medical issues, albeit inappropriate discussions like vaginal shaving and genital hygiene.

22. Next, however, he shifted the conversation to a personal nature.

23. Greer next started telling Charity that he'd been attracted to her ever since he met her. He said he'd like to take her to the Yogo Sapphire mine (knowing she was a "rock hound" from her confidential medical and personal history in her medical records).

24. She tried to deflect the come-on by stating she thought it was closed, but he insisted that she should go out with him.

25. Charity was stunned, and she didn't know how to react. Charity was suffering from a major medical condition that required medical treatment; it was life-threatening and without medical care she felt that she would die. This sexual come-on totally shocked her and she did not know how to react without risking the critical medical care which she desperately needed.

26. With a stunned, seemingly innocuous "OK" response from her, Greer then took out his phone and started to enter her personal phone number from the chart into his cell phone.

27. As he was doing so, he kept repeating that they have to keep this on "the down low" because this was a small town and he still wanted to be her doctor.

28. By this time, Charity was in a seated position and Greer was on a stool next to the exam table. He was holding her chart on his lap and he said to her "I guess I'll have to leave this on my lap all day to hide this", indicating that he had an erection.

29. She then immediately ended the interaction and left the exam room.

30. By the time she left the office and returned to her car, where she had left her phone, Greer had sent her a text message again referring to his erection saying "this is what you do to me" or words to that effect.

31. He followed that text message with a picture of himself wearing a cowboy hat.

32. Charity was extremely upset by this conduct and the shocking manner in which Greer capitalized on her vulnerability; she drove immediately to a friend's home and discussed the situation with her.

33. While there, Greer continued to send Charity text messages about going to the Renova Hot Springs. The invitation was oddly personal, but then again couched as innocent by suggesting a "public" activity which he knew she enjoyed based on his knowledge of her likes and dislikes gleaned from his introspective conversations with her as her doctor.

34. Charity reluctantly agreed to go to the Renova Hot Springs with him the next day, but she insisted they meet at Three Bears so he would not know where she lived.

35. As they drove up together, Greer told her again "we have to keep this on the down low" because I am supposed to "fire you as a patient" because we are dating, but I want to stay on as your doctor. So, we can't tell anyone about this.

36. Charity rebuffed the "relationship" characterization and made a comment about how they were just friends.

37. They arrived at the Renova Hot Springs and when they exited his vehicle, Greer immediately stripped down and stood there naked directly exposing himself to her.

38. Charity was shocked; she had worn shorts outside of a full bathing suit covered by a tank top, and this act, in public, completely took her off guard. She immediately pointed out that there was another person in the pool, pointing toward the pools, and he reluctantly put on trunks or shorts.

39. Charity tried to stay away from him the rest of the afternoon, even leaving when he insisted on moving to the pool she was sitting in. She left and began walking down the road. He came up behind her, grabbed her by the hips, lifted her up, and then pressed his erect penis against her body and "grinded".

40. The remainder of the evening was an uncomfortable stand-off with her rebuffing his advances while she tried to hold out until he drove her home. On the ride home, Greer invited her to his house the next night to watch a movie; he stated "I live just five minutes from you."

41. When home, Charity reported the events to her husband and questioned "How does he know where I live?"

42. On June 20, 2021, at approximately 7:15 p.m., Charity drove from her house to the location where Greer said he lived; she wanted to see where this was so she could avoid the location. The concern was, as well, how did he find out where she lived.

43. While driving, she was surprised to see Greer standing on his balcony waving at her to come in. Feeling trapped, she went to the balcony to try and diffuse the situation because she felt she could not lose her doctor.

44. The need to keep her physician for life-saving treatments dominated her conduct; Charity felt threatened by Greer that if she didn't remain friends or act friendly that he would, in fact, "fire her" as a patient as he had threatened.

45. When she met with him on the balcony, he invited her to watch a movie; feeling trapped, she went in to watch the movie.

46. During the conversation inside, he awkwardly guided the discussion to his history of herpes. He said he had herpes in the past, then shockingly he referred to her medical records revealing that he had looked at them and now he was using information from those records to make a sexual inuendo – he said "I don't like condoms. Because [deleted HIPAA information] then I don't have to use a condom."

47. Charity was shocked from multiple standpoints:

    a. He talked with a patient in that manner;

    b. He talked about his own sexual history and STD past;

    c. He talked about sexual intercourse with her;

    d. He used her private medical history as a means of seeking sex from her; and

    e. He suggested that he (her Doctor) could have sex with her (his Patient).

48. As soon as the movie was over, Charity tried to leave.

49. Greer blocked her path and prevented her from leaving; she turned away and looked for another exit.

50. Greer grabbed her from behind, he lifted her forcefully by the hips, and he pushed his erect penis against her and grinded as he spoke – he said: "You don't have to leave."

51. Charity pulled away and retreated into a corner. Greer approached her and said about the shorts she was wearing "Those aren't my favorites – I like the ones you were wearing in the office." – referring to the office visit on May 17, 2021.

52. Greer then said to her "Besides your boobs, your legs are your best feature." All this was done with a leering gaze, attempted sensualization of his voice, and a subtle move toward her.

53. Charity pushed her way out of the apartment and returned home where she informed her husband what had happened.

54. On May 21, 2021, Greer told Charity he had to go to Billings for a conference. While gone, she received dozens of text messages from him that contained lurid commentary, sexual suggestions, and the apparent "confession" that he had sex with a woman in Billings.

55. On May 23, 2021, Greer texted Charity and invited her to "come over". She did not agree to come over and tried to keep him at bay, while at the same time trying to protect her medical treatment to which she was emotionally and psychologically attached. The fear of losing medical treatment caused her to continue to engage in this recognized risky behavior of trying to keep Greer from dropping her as a patient.

56. On June 3, 2021, Greer texted Charity and was ranting about "your friend" who was spreading rumors about their relationship. Greer identified the person who was spreading rumors as "Nicole".

57. Charity did not know who Nicole was, nor did she acknowledge that they were in a relationship. Charity told Greer this and he expressed anger.

58. On June 4, 2021, Greer telephoned Charity and told her "You need to get rid of the fucking leak" in a reference to the apparent increasing knowledge of his activity within Community Health and apparently referring to this Nicole person.

59. Charity later learned that Nicole worked at Community Health and that she was friends with Charity's friend, [name removed for privacy and protection].

60. On June 14, 2021, Greer came to Charity's home; he had never been to her home and it shocked her that he would take such a liberty as to approach her at her home. During this intrusion, he said:

    a. He was leaving, he only had 30 minutes;

    b. Community Health CEO had called him in;

    c. They were asking questions about the situation; and

    d. He warned that Community Health might be calling her.

61. On June 16, 2021, Charity did receive a call from Community Health CEO Shawna Yates. Yates informed Charity that Community Health was initiating "an investigation" into rumors about her relationship with Greer. Yates informed Charity that Community Health had informed or told Greer to "fire her" as a patient and that she was to have received a certified letter telling her that. Yates went on to state that Greer was informed or told to wait 30 days after that letter before he could start to "date" her.

62. Charity told Yates that there was no relationship; Greer was pursuing her and she was afraid and didn't know what to do since she desperately need medical care for her active medical condition.

63. Yates' tone changed, and she offered Charity a female doctor at Community Health.

64. On June 18, 2021, Yates again contacted Charity and provided a series of details about the investigation:

    a. Yates told her that Nicole had been "released" from her job at Community Health;

    b. Yates told her that none of this was her [Charity's] fault; and

      c. Yates hoped she felt better.

65. Charity specifically asked Yates: "Why would you have a doctor at the clinic who had a four-year suspension?" Yates response was "We believe in giving second chances."

66. The acknowledgment by Yates made clear that Community Health was, in fact, aware of Greer's past and yet they allowed him to have access to patients, especially female patients.

67. Charity questioned this rationale, as well as the rationale for firing the employee who essentially reported Greer's sexual activity and pursuit of a patient.

68. On July 26, 2021, Charity called Yates and asked "When do I give my statement as part of the investigation?"

69. Yates' response was alarming – Yates told her that "***the investigation was dropped.***"

70. Yates told Charity that Greer had been fired (sometime between June 18, 2021, and July 26, 2021) and so they "***dropped***" the investigation.

71. Charity was in a state of disbelief; the fact that Yates considered the sexual assault on her, and perhaps others, was dropped simply because they fired Greer was incomprehensible. She retreated emotionally; she felt betrayed; and, she was afraid to engage in her job, personal activity, or anything else besides living in fear.

## IV.
## Claims and Causes of Action

### Count 1 – SEXUAL ASSAULT BY JORDAN GREER

72. Plaintiff realleges paragraphs 1-71 as though fully set forth herein.

73. Greer purposely or knowingly made physical contact of an insulting or provoking nature with Charity when he exceeded the limits of a medical exam in the manner he touched her.

74. Charity has suffered damages in an amount to be proven at trial, but generally consisting of emotional distress related to Greer's conduct, included embarrassment, fear, sleeplessness,

mistrust of authority, and anxiety.

75. Greer made sexual contact with Charity by touching of her intimate parts in order to knowingly or purposely humiliate, harass, or degrade her.

76. Greer made sexual contact with Charity by touching of her intimate parts in order to knowingly or purposely arouse or gratify his own sexual response and desire, or to gratify Charity's own sexual response or desire..

77. Charity has suffered damages due to Greer's sexual assault of her in an amount to be proven at trial, but generally consisting of emotional distress related to Greer's conduct, included embarrassment, fear, sleeplessness, mistrust of authority, and anxiety

### Count 2 – ASSAULT BY JORDAN GREER

78. Plaintiff realleges paragraphs 1-77 as though fully set forth herein.

79. Greer purposely or knowingly made physical contact of an insulting or provoking nature with Charity when he exceeded the limits of a medical exam in the manner he touched her.

80. Charity has suffered damages due to Greer's assault of her in an amount to be proven at trial, but generally consisting of emotional distress related to Greer's conduct, included embarrassment, fear, sleeplessness, mistrust of authority, and anxiety.

### Count 3 – STALKING BY JORDAN GREER

81. Plaintiff realleges paragraphs 1-80 as though fully set forth herein.

82. Greer's multiple times driving by Charity's house when she had not provided him with her address created a course of conduct by Greer.

83. Greer purposely or knowingly engaged in a course of conduct direct at Charity.

84. Greer knew or should have known the course of conduct would cause a reasonable person to fear for the person's own safety or the safety of a third person.

85. Greer knew or should have known the course of conduct would cause a reasonable person to suffer other substantial emotional distress.

86. Charity has suffered damages due to Greer's stalking of her in an amount to be proven at trial, but generally consisting of emotional distress related to Greer's conduct, included embarrassment, fear, sleeplessness, mistrust of authority, and anxiety.

### Count 4 – INVASION OF PRIVACY BY JORDAN GREER
(Use of Telephone to Harass)

87. Plaintiff realleges paragraphs 1-86 as though fully set forth herein.

88. Charity had a reasonable expectation of privacy that she could provide her phone number to Community Health without Greer calling her for non-treatment related purposes.

89. Greer wrongfully intruded on Charity's private activities by calling her and texting her on the telephone and interrupting her peace and solitude, for the purpose of soliciting a date, which was not the medical purpose for which Charity provided Community Health with her phone number.

90. The manner of Greer's wrongful intrusion into Charity's private activities was outrageous and caused her mental suffering, shame, and humiliation.

91. The manner of Greer's wrongful intrusion would be outrageous and cause mental suffering, shame, and humiliation to any person of ordinary sensibilities.

92. Charity has suffered damages due to Greer's invasion of her privacy in an amount to be proven at trial, but generally consisting of emotional distress related to Greer's conduct, included embarrassment, fear, sleeplessness, mistrust of authority, and anxiety.

### Count 5 – INVASION OF PRIVACY BY JORDAN GREER
(Use of HIPAA-protected Information to Harass by Phone and to Stalk)

93. Plaintiff realleges paragraphs 1-92 as though fully set forth herein.

94. Charity had a reasonable expectation of privacy that she could provide her phone number and

address to Community Health without Greer calling her for non-treatment related purposes or slowly driving by her house.

95. The Health Insurance Portability and Accountability Act (HIPAA) requires health care providers to protect the confidentiality of protected health information, including phone numbers and addresses of patient.

96. HIPAA requires that health care providers only use confidential and protected health information for legitimate, treatment related purposes.

97. Greer wrongfully intruded on Charity's private activities by using her HIPAA-protected phone number to call her.

98. Greer wrongfully intruded on Charity's private activities by using her HIPAA-protected address to stalk her by driving slowly past her house.

99. The manner of Greer's wrongful intrusion into Charity's private activities was outrageous and caused her mental suffering, shame, and humiliation.

100. The manner of Greer's wrongful intrusion would be outrageous and cause mental suffering, shame, and humiliation to any person of ordinary sensibilities.

101. Charity has suffered damages due to Greer's invasion of her privacy in an amount to be proven at trial, but generally consisting of emotional distress related to Greer's conduct, included embarrassment, fear, sleeplessness, mistrust of authority, and anxiety.

**Count 6 – NEGLIGENT INFLICTION OF EMOTION DISTRESS BY JORDAN GREER**

102. Plaintiff realleges paragraphs 1-101 as though fully set forth herein.

103. Greer acted negligently in his treatment of Charity.

104. Greer's actions were the cause of Charity's emotional distress.

105. Charity has suffered and continues to suffer severe emotional distress as a result of Greer's

actions, including but not limited to, embarrassment, mental anguish, sleeplessness, anxiety, and fear.

106. Charity's emotional distress is the reasonably foreseeable consequence of Greer's negligent actions.

### Count 7 – NEGLIGENT HIRING BY COMMUNITY HEALTH
### (Initial Hiring After Alaska License Surrendered)

107. Plaintiff realleges paragraphs 1-106 as though fully set forth herein.

108. Every employer owes a common law duty to exercise due care in the employment of employees.

109. Medical providers, particularly, must take reasonable care in hiring and supervising doctors and this duty necessarily includes the conduct of background checks and reference checks prior to employment.

110. When Community Health hired Greer, it had a duty to its patients to ensure that hiring Greer would allow the patients to obtain competent medical care without fear of being sexual assaulted, stalked, or having their privacy invaded.

111. A minimal effort to conduct a background check would have revealed that Greer had surrendered his license to practice medicine only a year before Community Health hired him.

112. Community Health breached that duty by failing to conduct a proper background check, or if it did conduct a background check, it failed to discover or properly interpret Greer's background prior to hire.

113. Community Health's breach has caused damage and injury to Charity.

### Count 8 – NEGLIGENCE FOR FAILURE TO PROTECT
### CONFIDENTIAL HEALTH INFORMATION BY COMMUNITY HEALTH

114. Plaintiff realleges paragraphs 1-113 as though fully set forth herein.

115. HIPAA requires health care providers to protect the confidentiality of protected health information, including phone numbers and addresses of patient.

116. HIPAA requires that health care providers only use confidential and protected health information for legitimate, treatment related purposes.

117. Community Health owed a duty to Charity as its patient, to protect her confidential patient information.

118. Community Health breached that duty when it let a predator (Greer) have access to her HIPAA-protected phone number and address, which Greer then used to harass, stalk, and invade the privacy of Charity.

119. Community Health's breach has caused damage and injury to Charity.

## Count 9 – NEGLIGENT SUPERVISION BY COMMUNITY HEALTH

120. Plaintiff realleges paragraphs 1-119 as though fully set forth herein.

121. Community Health had a duty to its patients to supervise the activities of its doctors, to make sure their interactions with patients were appropriate and their conduct in align with clinic policies and procedures.

122. Community Health breached its duty to supervise Greer and keep its patients safe when it failed to supervise the activities of Greer.

123. Community Health's breach of its duty to supervise Greer and protect its patients has a causal link to the harm suffered by Charity.

124. Had Community Health properly supervised Greer while treating patients it would have learned of his proclivity for inappropriate treatment of female patients.

125. Due to Community Health's breach of its duty to protect its patients, Charity has suffered damages.

## Count 10 – NEGLIGENT RETENTION BY COMMUNITY HEALTH
(Continuing to Employ After Report of Sexual Assault)

126. Plaintiff realleges paragraphs 1-126 as though fully set forth herein.

127. Every employer owes a common law duty to exercise due care in the continued employment of employees.

128. Medical providers, particularly, must take reasonable care in hiring, supervising, and retention of doctors.

129. This duty includes investigating reports of misconduct by doctors, including sexual assault of a patient.

130. Community Health breached that duty by failing to investigate Charity's report to Yates of Greer sexually assaulting her.

131. Due to Community Health's breach of care to protect its patients, Charity has suffered damages.

## V.
## Exemplary Damages

132. Plaintiff realleges paragraphs 1-131 as though fully set forth herein.

133. Greer acted with actual malice and/or actual fraud in sexual assaulting, stalking, invading Charity's privacy, and causing her emotional distress, entitling Charity to punitive damages under M.C.A. § 27-1-221.

134. Community Health acted with actual malice and/or actual fraud when it hired Greer without conducting a background check; provided him with access to confidential records which allowed him to stalk, invading Charity's privacy, and cause her emotional distress; and retained Greer after learning he had sexually assaulted Charity, entitling Charity to punitive damages under M.C.A. § 27-1-221.

## Prayer for Relief

Wherefore, Plaintiff prays for relief as follows:

A. An award of compensatory damages for each and every claim;

B. An award of punitive damages in an amount sufficient to discourage Greer from using his position of power as a doctor to sexually assault, harass, and stalk his patients;

C. An award of punitive damages in an amount sufficient to discourage Butte-Silver Bow Primary Health Care Clinic from failing to conduct background checks on doctors, from failing to supervise its doctors, and for retaining doctors on staff after receiving sexual assault reports;

D. An award of attorney fees and costs as allowed by statute or in equity; and

E. For any other relief the Court deems just under the circumstances.

DATED this 3rd day of September, 2021.

/s/ *Lawrence E. Henke*
LAWRENCE E. HENKE

## DEMAND FOR JURY TRIAL

Comes now the Plaintiff, by and through her counsel, and hereby demands a jury trial.

DATED this 3rd day of September, 2021.

/s/ *Lawrence E. Henke*
LAWRENCE E. HENKE

## **VERIFICATION**

STATE OF MONTANA )
:ss.
County of Silver Bow )

Charity Jones, being first duly sworn upon oath, deposes and says:

That she is the Plaintiff in this matter and she has read the Complaint and Demand for Jury Trial in this matter and that the facts and matters contained therein are true and accurate and complete to the best of her knowledge and belief.

*/s/ Charity D. Jones*
CHARITY JONES

Subscribed and sworn to before me this 3rd day of September, 2021.

*/s/ Keisha Scown*
Signature

Keisha Scown
Printed Name
Notary Public for the State of Montana
Residing at Butte, Montana, MT
My Commission expires June 02, 2025

**KEISHA SCOWN**
NOTARY PUBLIC for the
State of Montana
Residing at Butte, Montana
My Commission Expires
June 02, 2025